UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
C.W.L. and E.L., on behalf of C.L., a minor child,    :
                   Plaintiffs-Appellants,    :
                                    :          **OPINION AND ORDER**
v.                                   :
                                   :          14 CV 9705 (VB)
THE PELHAM UNION FREE SCHOOL    :
DISTRICT,    :
                  Defendant-Appellee.    :
-------------------------------------------------------------x

Briccetti, J.:

       Plaintiffs C.W.L. and E.L. (collectively, "Parents") bring this action against the Pelham

Union Free School District (the "District") pursuant to the Individuals with Disabilities

Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, et seq.  The Parents seek judicial

review of a decision by a State Review Officer ("SRO") at the New York State Education

Department, who found that the District offered Parents' child, C.L., a free appropriate public

education ("FAPE") for the 2011-12 and 2012-13 school years, and denied Parents' request for

tuition reimbursement.

       The District and Parents have each moved for summary judgment.  (Docs. ##13, 15).  For

the reasons set forth below, Parents' motion is DENIED, and the District's motion is

GRANTED.  The SRO's decision is affirmed in all respects.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I.     Statutory Framework

The IDEA was enacted to promote the education of disabled children.  20 U.S.C.

§ 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).  States receiving public funds are

required to provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  Public

school districts must provide "'special education and related services' tailored to meet the unique

needs of a particular child, [which are] 'reasonably calculated to enable the child to receive

educational benefits.'"  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)

(quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children

with disabilities residing in the State" to determine whether they require special education and

related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d

Cir. 2006).  This so-called "child find" obligation extends to children who are "suspected of

being a child with a disability."  34 C.F.R. § 300.111(c)(1).

The IDEA requires states to create an individual education plan ("IEP") for each disabled

student.  See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d

356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP for each

handicapped child.").  The IEP is a "comprehensive statement of the educational needs of a

handicapped child and the specially designed instruction and related services to be employed to

meet those needs."  Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985).

If the state fails to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school from the local board of education.  See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369-70, 374.

In New York, parents seeking such reimbursement must first file a due process complaint challenging the appropriateness of the IEP.   FB v. New York City Dep't of Educ., 923 F. Supp. 2d 570, 577 (S.D.N.Y. 2013).  An impartial hearing officer ("IHO") administers a hearing on the parents' complaint.  See N.Y. Educ. Law § 4404(1).  A board of education is required to reimburse parents for private educational services if: (1) the board fails to establish the student's IEP provided a FAPE; (2) the parents establish their unilateral placement was appropriate; and (3) equitable considerations favor the parents' claim.  See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013).  The IHO's decision may be appealed to an SRO.  See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g).  The SRO's decision may be challenged in federal court. See 20 U.S.C. § 1415(i)(2)(A).

II.    Factual Background

The following factual background is largely undisputed.

A.    C.L. in the District schools

C.L. was born July 31, 1995, and attended District public schools from kindergarten through March of his sophomore year of high school.

Beginning in the sixth grade, three of C.L.'s closest friends went to private schools and

C.L. experienced a "difficult . . . transition to middle school."  (Tr. 619-20).[1]  In the eighth grade,
C.L. was diagnosed with depression and anxiety.  On October 13, 2008, while in eighth grade,
C.L. attempted suicide.  C.L. was then admitted to a psychiatric hospital for approximately two
weeks.  While C.L. was at the psychiatric hospital, Parents met with the middle school principal,
the school psychologist, and C.L.'s counselor about how to reintroduce C.L. to school, taking
into account his psychological and psychiatric care.

When C.L. returned to school, he met frequently with the school psychologist because it
was emotionally difficult for him to stay in class.  C.L.'s mother spoke with the middle school
psychologist two to three times per week.  C.L. was hospitalized again for about a week in
November 2008, because the school psychologist felt he was in danger to himself.  During the
remainder of eighth grade, C.L. cut class and started failing classes.

C.L. enrolled at Pelham Memorial High School ("PMHS") for ninth grade.  He began
seeing psychiatrist Dr. Harold Abellard in addition to a psychologist, Dr. Nelson.  Although he
was still socially isolated, C.L.'s attendance and grades improved.

In October of tenth grade, C.L. was hospitalized again for suicidal ideations upon the
recommendation of District psychologist Dr. Jeanean Hergenrother.  In December, C.L. told
Parents he wanted to kill himself when he turned 18 years old.  Parents then hospitalized C.L.
and told Dr. Hergenrother about this conversation.  C.L.'s doctors increased his medication and
C.L.'s mother informed Dr. Hergenrother a few days later that "[C.L.] says the suicidal thinking

---

[1]     All citations to "Tr." refer to the transcript of the proceedings before the Impartial
Hearing Officer.

has essentially stopped."  (Ex. 44 at 37).[2]

C.L. returned to school and remained "absolutely miserable" at PMHS because "he felt completely ostracized.  There was no one to sit in the lunchroom with.  Kids didn't want anything to do with him."  (Tr. 658-59).  C.L. visited Dr. Hergenrother several times per week.  The guidance office "was his timeout place if he needed to leave" where he would go "just hang out on the sofas."  (Tr. 661-62).

In March of C.L.'s sophomore year, Dr. Hergenrother approached Rosemary Matthews, Assistant Superintendent for Pupil Personnel Services for the District, about whether to refer C.L. to the Committee on Special Education ("CSE").  Dr. Hergenrother and Ms. Matthews decided to refer C.L. to the CSE.

Around the same time, C.L.'s mother began researching alternative schools and discovered the Robert Louis Stevenson School ("RLS").  C.L. was accepted at RLS, and C.L.'s mother informed Dr. Hergenrother and Gena Archer, the guidance counselor at PMHS, via email on March 21, 2011, that C.L. would be starting there on April 5, 2011.  Dr. Hergenrother and Ms. Matthews did not refer C.L. to the CSE because Parents placed C.L. at RLS.

B.   C.L. at RLS

RLS is a private school located in New York City.  It focuses on academic development for bright students with some level of emotional disability.  It has class sizes of between eight and ten students.

On May 21, 2011, Parents executed a contract enrolling C.L. at RLS for the 2011-12 school year.  C.L. attended RLS for both the 2011-12 and 2012-13 school years.  Tuition was

---

[2]     Citations to "Ex." refer to exhibits in the administrative record.

$49,000 for the 2011-12 school year, and $51,000 for the 2012-13 school year.  C.L. excelled academically and socially at RLS.

       C.     <u>C.L.'s IEPs</u>

On March 21, 2011, based on the advice of counsel referred by RLS, Parents sent a letter to the New York City Department of Education's CSE requesting evaluations and special education services for C.L.[3]

On June 25, 2011, Dr. David Singer from the New York City Department of Education CSE conducted a psycho-educational evaluation of C.L.  Dr. Singer concluded C.L. experienced "considerable anxiety and depression," but was "able to often recover from the feelings."  (Ex. 7).  Dr. Singer noted C.L.'s "[e]ducational skills vary slightly from below average for his grade level in calculation to considerably above grade level in reading recognition, reading comprehension, and problem solving."  (<u>Id</u>.).

On July 28, 2011, the City Department of Education developed an Individualized Education Services Program ("IESP") for C.L., classifying him as a student with an emotional disturbance.  However, C.L. was not offered a placement because Parents and C.L. lived in Pelham, in Westchester County.

On August 1, 2011, after consulting with new counsel, Parents contacted Ms. Matthews and requested an IEP from the District.  On August 3, 2011, Ms. Matthews informed C.L.'s father the District would send him the IEP package to initiate the IEP process.  Over the course of several days in September and October, the District completed educational, social,

---

[3]      The attorney referred by RLS instructed Parents to seek an evaluation by the New York City Department of Education because he mistakenly believed Parents and C.L. lived in New York City.

developmental, and psychological evaluations of C.L.

On October 13, 2011, the CSE convened to conduct C.L.'s program review and to develop an IEP for the 2011-12 school year.[4]  The CSE was comprised of Parents; Dr. Dayana Jimenez, Clinical Director at RLS; Dr. Abellard; Ms. Matthews; Dr. Hergenrother; Ms. Archer; Elizabeth Cronin, a District special education teacher; and other District personnel.  In addition, C.L.'s psychotherapist, Dr. Alec Miller, submitted a letter to the CSE.  During the meeting, C.L.'s mother read Dr. Miller's letter to the committee, which indicated PMHS had a negative influence on C.L. because he carried "psychological baggage . . . at Pelham."  (Tr. 695; Ex. 20). Dr. Abellard concurred, expressing concern for C.L.'s safety if C.L. were to return to PMHS. The Parents expressed Dr. Miller's and Dr. Abellard's opinions "repeatedly" to the CSE and stressed C.L. needed a placement with small classes where "he could feel safe and secure."  (Tr. 697-98).

Finding C.L. was eligible for special education and related services as a student with an emotional disturbance, the CSE drafted an IEP recommending placement in the District's therapeutic support program ("TSP") with daily, indirect consultant teacher services, a daily resource room, counseling services, and a positive reinforcement plan program.  The TSP program had eight to ten students and, in addition to a resource room period, students could go to the TSP room during other periods.  The CSE noted structure and routine mitigate C.L.'s anxiety.  The CSE also recommended testing accommodations, created annual goals, and

---

[4]      The district initially planned for the CSE to conduct an "initial referral" review of C.L. The District changed the meeting to a "program review" after it learned the New York City Board of Education had already evaluated C.L. and found him eligible for special education programs and related services as a student with an emotional disturbance.

developed a post-secondary transition plan.

The District sent Parents a notice on November 7, 2011, informing Parents it supported the recommendations of the CSE.  C.L.'s father testified he received the IEP on November 26, 2011.  Parents then sent Ms. Matthews a letter dated December 6, 2011, informing the District Parents were keeping C.L. at RLS and were seeking reimbursement.  On May 7, 2012, Parents executed a contract enrolling C.L. at RLS for the 2012-13 school year.

On May 14, 2012, the CSE convened to conduct a review of C.L.'s IEP for the 2012-13 school year.  On June 11, 2012, the CSE reconvened and drafted an IEP.  Parents reiterated the recommendations of C.L.'s psychiatrist and psychologist that returning to PMHS would be detrimental to C.L.'s wellbeing.

The June 2012 CSE drafted an IEP recommending a similar program as the October 2011 CSE.  The June 2012 CSE recommended placement in the TSP program with daily, indirect consultant teacher services, a daily resource room, and counseling services (including an additional 30 minute session of individual counseling and a 30 minute group session per six day cycle).  The June 2012 CSE also recommended a positive reinforcement plan and weekly feedback from a case manager to review C.L.'s academic progress to keep from becoming overwhelmed by his workload.  (Ex. 39 at 7).[5]  On September 21, 2012, Parents sent the District a letter stating the CSE did not make an appropriate recommendation for C.L. and they would be seeking reimbursement.

---

[5]     On June 4, 2012, Parents signed consent for C.L.'s twin sister to participate in the TSP program.  Conflict with his sister was "emotionally a trigger" for C.L; the CSE did not explore this "sibling issue."  (Tr. 703).

D.    Parents' Due Process Complaint

By due process complaint notice dated June 24, 2013, Parents alleged the District failed to offer C.L. a FAPE for the 2011-12 and 2012-13 school years.

For the 2011-12 school year, Parents alleged the District's delay in finding C.L. eligible for special education programs and related services between July 2011 and October 2011 violated its child find obligations.  Parents also alleged the District failed to offer a FAPE for the 2011-12 school year because (i) it did not have an IEP in place at the start of the school year; (ii) the October 2011 CSE failed to describe how the consultant teacher services would be used; and (iii) the CSE failed to conduct a classroom observation of C.L.

For both the 2011-12 and 2012-13 school years, Parents asserted the District failed to recommend a "full-time special education program and placement" (Ex. 1 at 3) that would provide C.L. with the "necessary level of service and support" he required.  (Ex. 1 at 8).  Parents contended returning him to a District public school would be "detrimental."  (Ex. 1 at 6).  Parents asserted the recommended program's class size was "wholly inappropriate" for C.L. and he could not make progress in a "large mainstream classroom."  (Ex. 1 at 8).

Parents also alleged neither the October 2011 nor June 2012 CSE (i) provided an appropriate "level or type of social/emotional support"; (ii) conducted a Functional Behavioral Assessment ("FBA") of C.L. or developed a Behavioral Intervention Plan ("BIP") for C.L; or (iii) developed a crisis management plan to address C.L.'s "depression and low frustration level." (Ex. 1 at 9-10).  In addition, Parents asserted the annual goals were generic, vague, incomplete, or were not measurable, and C.L. would not be grouped with "peers that struggle[d] with similar needs."  (Id.).

Parents requested the IHO find that the District failed to offer C.L. a FAPE for the 2011-12 and 2012-13 school years, RLS was an appropriate unilateral placement for C.L., and equitable considerations weighed in favor of their requested relief.

E.     The IHO Decision

The parties proceeded to a four-day impartial hearing, which concluded December 18, 2013.  On May 5, 2014, the IHO concluded the District failed to offer C.L. a FAPE for both the 2011-12 and 2012-13 school years, RLS was an appropriate unilateral placement for C.L., and equitable considerations did not preclude granting Parents' request for tuition reimbursement. The IHO also found the District violated its child find obligations for the 2010-11 school year.

With respect to the 2011-12 and 2012-13 school years, the IHO concluded the recommended programs "would place [C.L.] in general education classes at Pelham which he failed at during his previous year."  (IHO at 44).[6]  The IHO held neither the October 2011 CSE nor the June 2012 CSE gave adequate consideration to the input of Parents, C.L.'s psychiatrist, C.L.'s psychologist, or RLS staff.  The IHO found neither the October 2011 CSE nor the June 2012 CSE (i) included sufficient annual goals or management needs to address C.L.'s emotional disturbance; (ii) included a crisis management plan; (iii) referenced the C.L.'s medication; or (iv) addressed C.L.'s contentious relationship with his twin sister.

The IHO also concluded RLS's therapeutic setting catering to students with high intellect provided C.L. with an educational program that enabled him to receive educational benefits.

---

[6]     All citations to the "IHO" refer to the IHO's "Findings of Fact and Decision," dated May 5, 2014.

F.       The SRO Decision

The District appealed, asserting several ways in which the IHO erred.  First, the District

argued the IHO exceeded her jurisdiction in finding the District failed to meet its child find

obligations during the 2010-11 school year because Parents did not challenge the 2010-11 school

year in the due process complaint.  Second, the District asserted the IHO erred in finding the TSP

was not appropriate for C.L. because the TSP offered C.L. appropriate support to meet his needs.

Third, the District argued the IHO erred in finding C.L.'s levels of performance did not

accurately reflect C.L.'s academic achievement and functional performance.  Fourth, the District

asserted the June 2012 IEP reflected the CSE's review and consideration of school reports from

RLS, input from RLS staff, and C.L.'s psychologist – contrary to the IHO's assessment.  Fifth,

the District argued the annual goals in the October 2011 and June 2012 IEPs (together, the

"IEPs") were appropriate and measurable.  Finally, the District contended Parents' unilateral

placement of C.L. at RLS was not appropriate and equitable considerations did not weigh in

favor of the parents' requested relief because they did not timely provide the District with a 10-

day notice of unilateral placement.

Parents responded with an answer seeking to uphold the IHO's decision in its entirety.

Parents alleged the District improperly attempted to use retrospective testimony to discuss the

implementation of the IEPs and to repair deficiencies therein.

In a 34-page single-spaced decision, the SRO sustained the District's appeal and thereby

denied Parents' request for tuition reimbursement.

1.       Scope of the Impartial Hearing

The SRO first considered the proper scope of the issues decided by the IHO.  The SRO

11

concluded the IHO exceeded her jurisdiction by addressing three issues Parents did not raise in

their due process complaint: (i) whether the district violated its child find obligations for the

2010-11 school year; (ii) whether the IEPs were not appropriate due to the absence of

management needs; and (iii) whether the IEPs were not appropriate due to the failure to note

C.L.'s medication.  Because Parents did not seek the District's agreement to expand the scope of

the impartial hearing to include these issues, or seek to amend their due process complaint notice

to include these issues, the SRO concluded the IHO exceeded her jurisdiction by addressing

them.

2.    October 2011 CSE Process

Second, the SRO considered whether the level of performance in the October 2011 IEP

accurately reflected C.L.'s academic achievement and functional performance. The SRO

scrutinized the hearing record and found the October 2011 CSE considered several sources of

evaluative information, including (i) a January 2011 health report; (ii) a June 2011

psychoeducational evaluation; (iii) a June 2011 RLS educational evaluation; (iv) a June 2011

social history; (v) C.L.'s July 2011 IESP; (vi) a September 2011 psychological evaluation; (vii)

an October 2011 letter from C.L.'s psychologist; and (viii) an October 2011 social and

developmental history.

The SRO found the October 2011 IEP reflected the CSE's use of multiple assessments to

describe C.L.'s present levels of performance and special education needs.  The SRO concluded

the description of C.L.'s needs in the October 2011 IEP was consistent with the evaluative

information, including the RLS's Director's input, the District psychologist, C.L.'s private

psychiatrist, and Parents.

The SRO also concluded the October 2011 CSE was not obligated to perform a

classroom observation of C.L. because the CSE had sufficient evaluative information available.

        3.    October 2011 IEP

Next, the SRO addressed the substantive adequacy of the October 2011 IEP in three

ways.

The SRO first found, contrary to the IHO's decision, the October 2011 IEP contained

seven annual goals addressing C.L.'s needs in self-advocacy; study skills; social, emotional, and

behavioral skills; and coping strategies. The SRO's review of the record supported a conclusion

the annual goals targeted C.L.'s areas of need and addressed those needs. The SRO noted each

of the annual goals included a schedule and criteria by which to measure progress.

The SRO also addressed Parents' assertion the October 2011 IEP was deficient because it

did not contain a functional behavioral assessment ("FBA"), a behavioral intervention plan

("BIP"), or a crisis management plan. The SRO concluded C.L. did not engage in behaviors

impeding his learning or that of others that would necessitate inclusion of an FBA, BIP, or a

formalized crisis management plan.

The SRO based this conclusion on many aspects of the evaluative information in the

record: (i) C.L. was "an active participant in class who related well with teachers and classmates

and completed assignments"; (ii) the District responded to C.L.'s emotional crises and related

needs at the time of the crisis without having a formalized crisis management plan in place

during eighth and tenth grades; and (iii) "based on the evaluative reports and input from CSE

members including the parents and the RLS director, [C.L.] did not present at that time as being

in crisis."  (SRO at 20-21).[7]

The SRO also weighed whether the TSP recommended in the October 2011 IEP was reasonably calculated to enable C.L. to receive meaningful educational benefits.  The SRO found the IHO afforded weight to Parents' strong preference to education C.L. in small classes and to continue his placement at RLS.  Contrary to the IHO, the SRO concluded the TSP program accorded with C.L.'s "very superior cognitive skills and high average to superior academic skills – along with his difficulties with social/emotional functioning."  (SRO at 21).  Specifically, the SRO noted the TSP would address C.L.'s anxiety and depression because it included a therapeutic support teacher, a teaching assistant, and a resource room to which students had access at any time during the day.  The IEP provided these resources while allowing C.L. to attend classes within a general education setting which the SRO found to be appropriate based on C.L.'s high cognitive abilities and because C.L. "was doing really well at that point."  (SRO at 23 (citing testimony of the District assistant superintendent)).

4.    June 2012 CSE Process

Similar to the October 2011 CSE, the SRO concluded the IHO erred in finding the present levels of performance in the June 2012 IEP did not accurately reflect C.L.'s then-current academic achievement and functional performance.

The SRO reviewed the record showing the June 2012 CSE subcommittee considered several sources of evaluative information, including: (i) a November 2011 RLS educational evaluation; (ii) an April 2012 RLS educational evaluation; (iii) a May 2012 letter from C.L.'s psychologist; and (iv) the evaluative information considered by the October 2011 CSE.  The

_____

[7]    All citations to the SRO refer to the SRO Decision No. 14-084, dated August 22, 2014.

SRO concluded the 2012 CSE had sufficient functional, developmental, and academic information about C.L.'s individual needs to develop his IEP.

     5.    June 2012 IEP

Similar to the October 2011 IEP, the SRO considered whether the annual goals in the June 2012 IEP were measurable and met C.L.'s needs, whether the June 2012 IEP should have included an FBA, a BIP, or a crisis management plan, and whether the TSP program was reasonably calculated to enable C.L. to receive meaningful educational benefits.

With respect to the June 2012 IEP's goals, the SRO found it was reasonable and appropriate for the CSE to recommend similar annual goals to the October 2011 IEP because the record showed C.L.'s academic, social, and emotional needs remained largely unchanged.  The SRO noted the June 2012 IEP modified the criteria upon which C.L.'s progress would be assessed and these modified criteria reflected C.L.'s demonstrated progress.

The SRO again found the IHO erred in finding the June 2012 IEP deficient for lacking an FBA, BIP, or crisis management plan because the record showed C.L. continued to improve in his social and emotional functioning.

Similarly, the SRO concluded the IHO erred because the recommended program was reasonably calculated to enable C.L. to receive meaningful educational benefits.  Unlike the October 2011 IEP, the June 2012 IEP added a group counseling session, which the District psychologist, Parents, and RLS Director agreed would provide C.L. with additional social feedback to assist him.  The SRO concluded, "[c]ontrary to Parents' assertions," the evidence in the record did not support the IHO's finding that the TSP program was not reasonably calculated to enable C.L. to receive educational benefits.  (SRO at 30-31).

6.    Challenges to the Assigned Public School

Finally, the SRO considered and rejected Parents' assertion the District could not

implement the October 2011 IEP or the June 2012 IEP.  The SRO found any arguments raised

with respect to the assigned public school site are speculative because such arguments would

require a retrospective analysis of how the District would have implemented those IEPs.  In the

alternative, the SRO held the evidence in the record did not support a conclusion the District

would have deviated from C.L.'s IEPs.

**DISCUSSION**

I.    Applicable Legal Standards

Motions for summary judgment usually resolve IDEA cases in federal court.  See Viola

v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  Unlike in an ordinary

summary judgment motion, the existence of a disputed issue of material fact will not necessarily

defeat the motion.  Id.  Rather, summary judgment in the IDEA context functions as an appeal

from an administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252

(2d Cir. 2009).

In a review action pursuant to the IDEA, the Court (i) reviews the record of the

administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii)

grants such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C.

§ 1415(i)(2)(C); see Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003).

The standard of review for IDEA cases has been characterized as "modified de novo."

M.R. v. South Orangetown Cent. Sch. Dist., No. 10-CV-1800 CS, 2011 WL 6307563, at *6

(S.D.N.Y. Dec. 16, 2011).  Although the court must engage in an independent review of the

record and make a determination based on a preponderance of the evidence, its review of state administrative decisions is limited.  See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06; Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129.  The Second Circuit has cautioned the IDEA requires "substantial deference to state administrative bodies on matters of educational policy."  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).  Thus, the court must be mindful "that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129 (quotation omitted), and should not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206.  "Deference is particularly appropriate" when the SRO's review has been "thorough and careful."  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129.

As the Second Circuit clarified in M.H. v. New York City Department of Educucation, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role."  685 F.3d 217, 244 (2d Cir. 2012).  Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP.  Id. (citing Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 195).  The Court also affords more deference to the SRO when the decision is "grounded in thorough and logical reasoning" and when the Court's "review is based entirely on the same evidence as that before the SRO."  Id.

Finally, "[w]hen an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision," unless the SRO's decision is

"insufficiently reasoned to merit that deference."  R.E. v. New York City Dep't of Educ., 694

F.3d 167, 189 (2d Cir. 2012) (internal quotation marks and alterations omitted).  Thus, an

appellant seeking to have a district court credit an IHO's determination over an SRO's

determination "would benefit from calling our attention to an SRO's specific errors in law, fact,

or reasoning."  M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d at 139.

II.     Issues outside the Scope of the IHO Review

        First, the Court finds the SRO correctly concluded the IHO improperly exceeded her

jurisdiction by sua sponte addressing whether the district violated its child find obligations for

the 2010-11 school year.  (SRO at 9-11).[8]

        The IDEA provides that a party requesting a due process hearing "shall not be allowed to

raise issues at the . . . hearing that were not raised in the notice . . . unless the other party agrees

otherwise," 20 U.S.C. § 1415(f)(3)(B), or the complaint is amended prior to the impartial hearing

by permission of the IHO.  20 U.S.C. § 1415(c)(2)(E)(i).  See, e.g., N.K. v. New York City Dep't

of Educ., 961 F. Supp. 2d 577, 584 (S.D.N.Y. 2013).  Alternatively, issues not included in a due

process complaint notice may be ruled on by an administrative hearing officer when the district

"opens the door" to such issues with the purpose of responding to a claim raised in the due

---

[8]     The SRO also found the IHO exceeded her jurisdiction by addressing (i) whether the
IEPs were not appropriate due to the absence of crisis management plan, and (ii) whether the
District denied C.L. a FAPE because the IEPs failed to note his medication.  However, unlike the
child find obligations for the 2010-11 school year and C.L.'s medication, Parents' due process
complaint did include an allegation regarding the IEP's lack of a crisis management plan.  (Ex. at
¶ 38) ("The district failed to develop a plan of action for crisis management, should C.L
depression [sic] and low frustration level surface during the school day.").  The IEP's alleged
omission of a crisis management plan was thus appropriately within the scope of the IHO's
review and is addressed below.  As to the medication issue, the SRO correctly concluded that it
was not raised in Parents' due process complaint, and, in any event, Parents do not appeal the
SRO's ruling in this respect.

process complaint notice.  M.H. v. New York City Dep't of Educ., 685 F.3d 217, 250 (2d Cir.

2012).  As the Second Circuit has noted, "[t]o permit [parents] to add a new claim after the

resolution period has expired would allow them to sandbag the school district."  R.E. v. New

York City Dep't of Educ., 694 F.3d 167, 187 n.4 (2d Cir. 2012).

Here, Parents assert the SRO failed to consider any claims existing prior to the

development of the October 2011 IEP and this failure was "without factual or legal merit."  (Pls.'

Br. at 8).  Parents now seem to argue their due process complaint did contain a child find claim

for the 2010-11 school year.[9]  But Parents concede they "requested no relief relating to the 2009-

2010 and 2010-2011 school years" (Pls.' Br. at 6.), undermining the notion the 2010-11 child

find obligations were properly within the scope of the IHO's review.

The record supports the SRO's finding that the due process complaint did not raise the

District's child find obligations for the 2010-11 school year.  The IHO herself stated "the Due

Process complaint is referencing FAPE for the 2011-12 and 2012-13 school years only and is not

addressing the 2010-11 school year"; yet, the IHO ruled on the District's 2010-11 child find

obligations sua sponte.  (IHO at 40 n.2).  The record does not reflect the District consented to the

IHO deciding novel issues.

_____

[9]     Parents cite two paragraphs from their due process complaint discussing C.L.'s "long
history of academic, social/emotional, and behavioral concerns," which concludes the District's
delay in classifying C.L. "was a violation of the District's Child Find Obligations."  (Pls. Br. at 2
(citing Ex. 1)).  But Parents made that allegation for the 2011-12 school year, not the 2010-11
school year.  See SRO at 4 ("With respect to the 2011-12 school year, the parents alleged that
district's delay in finding [C.L.] eligible for special education programs and related services
between July 2011 and October 2011 violated its child find obligations.").  Although "the IDEA
itself contemplates some flexibility," this is not a case where "Plaintiffs provided fair notice to
the [District] of their [2010-11 child find] claim."  C.F. ex rel. R.F. v. New York City Dep't of
Educ., 746 F.3d 68, 78 (2d Cir. 2014).

19

Moreover, the District did not "open the door" to such issues in responding to Parents' claims. The Second Circuit has held an issue may properly be within the scope of an IHO's review if a school district raises the issue to rebut an allegation raised in Parents' due process complaint. See M.H. v. New York City Dep't of Educ., 685 F.3d at 250 (holding the district opened the door by raising the disputed issue "first in its opening statement, and then in the questioning of its first witness," and "much of the testimony presented by both parties to the IHO related to the [issue]"). Here, Parents assert the District opened the door to its 2010-11 child find obligations with testimony about Response to Intervention ("RTI") strategies at the IHO hearing.

The Court finds otherwise.

The District's testimony regarding RTI merely described the District personnel's strategies in interacting with C.L. and was not used as an "excuse" or defense regarding the District's child find obligations for the 2010-11 school year. (Pls.' Br. at 5). Moreover, unlike in M.H., it is not "unfair" to allow the District's testimony about RTI strategies because "there is no indication that the [District] sought, let alone obtained, a strategic advantage by raising [them]." A.M. ex rel. Y.N. v. New York City Dep't of Educ., 964 F. Supp. 2d 270, 283 (S.D.N.Y. 2013); see Scott ex rel. C.S. v. New York City Dep't of Educ., 6 F. Supp. 3d 424, 439 (S.D.N.Y. 2014) (finding the district "did not agree to the expansion of the due process complaint" where the district only briefly addressed the issue). Thus, the District did not open the door to its child find obligations for 2010-11.[10]

---

[10]     Because Parents now argue their due process complaint did contain allegations regarding the District's child find obligations for the 2010-11 school year, the parties briefed the timeliness of such a claim. The Court need not decide whether such a claim is time-barred because the

In sum, the Court finds the SRO's conclusion that the IHO exceeded her jurisdiction by addressing the District's child find obligations for the 2010-11 school year to be well-reasoned and supported by a preponderance of evidence in the record.

III.    Procedural and Substantive Adequacy of C.L.'s IEPs

To decide whether an IEP complies with the IDEA, courts follow a two-part test.  See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206-07.  The first prong examines the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA."  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012) (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 192).  Procedural violations entitle parents to reimbursement if they "impede[] the child's right to a [FAPE]," "significantly impede[] the parents' opportunity to participate in the decisionmaking [sic] process regarding the provision of a [FAPE] to the parents' child," or "cause[] a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The second prong of the test weighs the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207.  "Substantive inadequacy automatically entitles the parents to reimbursement as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 160-61 (2d Cir. 2014) (internal quotations and citations omitted).  However, a school district is not required to provide "every special service

SRO correctly found the District's child find obligations for the 2010-11 school year were not properly before the IHO.

necessary to maximize each handicapped child's potential." <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. at 199.  An IEP is substantively adequate under the IDEA "if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d at 195 (internal quotations and citations omitted).

Because Parents and the District raise similar arguments as to both the October 2011 and June 2012 IEPs, the Court addresses the procedural adequacy of both IEPs before turning to the substantive adequacy of the IEPs.

     A.    <u>Procedural Adequacy of the IEPs</u>

Parents argue the SRO erred in concluding C.L.'s IEPs were procedurally adequate for several reasons.

     1.    <u>Failure to Have IEP In Effect</u>

Parents first argue the IEPs were procedurally deficient because they were not in effect at the beginning of the 2011-12 or 2012-13 school years.

A school district is required to have a written IEP "in effect" for each child with a disability "[a]t the beginning of each school year."  20 U.S.C. § 1414(d)(2)(A); <u>see</u> 34 C.F.R. § 300.342(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).  In New York State, by statute, the school year begins on the first day of July of each year.  <u>See</u> N.Y. Educ. Law § 2(15).

Here, Parents did not request an IEP from the District until August 1, 2011, after the start of the 2011-2012 school year.  Parents have not directed the Court's attention to any statute, regulation, or case law to support the proposition that a district denies a student a FAPE by failing to have an IEP in effect at the start of the school year when the Parents concede they

requested no relief for the prior school year[11] and requested an IEP after the start of the school

year in question.

With respect to the June 2012 IEP, the record reflects the District did have an IEP in

effect on June 11, 2012, prior to the first day of school for the 2012-13 school year.

Parents' first procedural contention therefore fails.

> 2.   Failure to Provide the October 2011 IEP in a Timely Fashion

Second, Parents argue the October 2011 IEP was procedurally deficient because they

were not provided with it in a timely manner.

School districts must ensure a copy of a child's IEP be provided to the parent.  See Cerra

v. Pawling Cent. Sch. Dist., 427 F.3d at 194; 34 C.F.R. § 300.345(f) ("The public agency shall

give the parent, on request, a copy of the IEP.").  Here, Parents allege they were not provided a

copy of the October 2011 IEP until November 26, 2011.  But an IEP need not be produced "at

the time parents demand."  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 193-4.[12]  Parents assert

the delivery of the 2011-12 IEP was not timely because it was delivered "after the 'Projected IEP

Start Date.'"  (Pls. Opp. at 7 n.4).  Parents failed to provide any support for such a timeliness

requirement.  Even assuming this is a procedural violation, Parents failed to articulate why this

procedural violation warrants relief.  See infra Part III(A)(4).

---

[11]    Importantly, Parents alleged the District denied C.L. a FAPE for the 2011-12 school year, but acknowledge they "requested no relief relating to the 2009-2010 and 2010-2011 school years."  (Pls.' Br. at 6).

[12]    Because Parents concede they requested no relief for the 2010-11 school year and requested an IEP after the start of the 2011-12 school year, the District did not fail to provide the IEP in a timely fashion by mailing the IEP after the first day of school.  Cf. C.U. v. New York City Dep't of Educ., 23 F. Supp. 3d 210, 226 (S.D.N.Y. 2014).

23

3.      Failure to Provide an FBA or Develop a BIP

Third, Parents contend the IEPs are inadequate for their failure to include a functional

behavior assessment ("FBA") or a behavior intervention plan ("BIP").

The IDEA requires a school district to "consider the use of positive behavioral

interventions and supports, and other strategies" to address behavior by a disabled child that

"impedes the child's learning or that of others."  20 U.S.C. § 1414(d)(3)(B)(i).  New York State

regulations "require a school district to conduct a full FBA for a student who exhibits behavior

that impedes learning, and to develop a BIP to address that behavior."  T.M. ex rel. A.M. v.

Cornwall Cent. Sch. Dist., 752 F.3d 145, 169 (2d Cir. 2014).

For the 2011 IEP, the SRO weighed evaluative information showing C.L. to be "an active

participant in class who related well with teachers and classmates and completed assignments,"

and noted C.L. was no longer engaged in maladaptive behaviors warranting an FBA or a BIP.

(SRO at 20).  Turning to the 2012 IEP, the SRO examined evaluative information available to

the June 2012 CSE subcommittee and found, "given [C.L.'s] improvement in the area of his

social/emotional functioning and his ability to exhibit adaptive behaviors rather than maladaptive

behaviors," the June 2012 CSE was not required to conduct an FBA or develop a BIP for C.L.

(SRO at 28).

The SRO's decision turns on whether C.L.'s behavior would interfere with his learning

and that of others.  These fact-specific educational questions are "precisely the type of issue upon

which the IDEA requires deference to the expertise of the administrative officers."  T.M. ex rel.

A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 169 (citations omitted).  Here, the SRO's decision

is well-reasoned and supported by the record.  Thus, the Court defers to the SRO's conclusion

that the District did not deny C.L. a FAPE by failing to conduct an FBA or prepare a BIP.

4.    Additional Procedural Allegations Regarding the 2011 IEP

Parents also allege the 2011 IEP was procedurally inadequate because (i) the District

used the RTI process to delay an evaluation of C.L.; (ii) C.L.'s dual enrollment did not abrogate

the District's responsibility to provide C.L. a FAPE; and (iii) the District failed to conduct a

classroom observation.[13]  Even if the Court were to consider these procedural arguments, they

would not justify overturning the SRO's decision.

Not every procedural error in the development of an IEP renders that IEP legally

inadequate.  See Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).  A

procedural error warrants relief "only if the alleged procedural inadequacies '(i) impeded the

child's right to a [FAPE]; (ii) significantly impeded the parents' opportunity to participate in the

decision-making process regarding the provision of [a FAPE] to the parents' child; or (iii) caused

a deprivation of educational benefits.'"  M.H. v. New York City Dep't of Educ., 685 F.3d at 245

(quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

None of these criteria is met here because neither C.L. nor Parents were prejudiced.

Parents removed C.L. from the school district and placed him at RLS in April 2011.  On May 22,

2011, Parents signed a contract enrolling C.L. at RLS for the 2011-12 school year.  Two months

later, Parents contacted the District for an IEP.  Parents took advantage of the opportunity to

participate in the decision-making process regarding C.L.'s IEPs.  C.L. remained at RLS for the

---

[13]    While these allegations arguably speak to the District's child find obligations for the
2010-11 school year, the Court addresses them here to the extent they allege the 2011 IEP was
procedurally inadequate.

years at issue.  There is no suggestion in the record Parents would have altered their placement

decision if the CSE drafted or delivered the IEP differently.  See Grim v. Rhinebeck Cent. Sch.

Dist., 346 F.3d at 382.

In short, there is no basis in the record for overturning the SRO's well-reasoned

conclusion that the alleged procedural inadequacies of C.L.'s IEPs did not deny him a FAPE for

either the 2011-12 or 2012-13 school years.

      B.      Substantive Adequacy of the IEPs

Parents' attacks on the substantive adequacy of C.L.'s IEPs can be grouped into four

categories:  (i) the IEPs' program was inadequate because they recommended "limited supports"

and C.L. must be educated in "a small, nurturing class environment" (Compl. at 17-18); (ii) the

IEPs' program failed accurately to reflect the results of C.L.'s evaluations; (iii) the IEPs' goals

were generic and vague; and (iv) the IEPs failed to develop a plan of action for crisis

management.

      1.      The Adequacy of the IEPs' Proposed Program

Parents challenge the District's recommendation C.L. participate in the TSP for the 2011-

12 and 2012-13 school years.  As noted above, the TSP is a program for students "having an

emotional disability that significantly impairs their academic functioning . . . where students are

given counseling on a regular basis, very structured, once, sometimes twice a week mandated, if

not more on an as needed basis."  (Tr. at 287).  The TSP has a dedicated room staffed by a

special education teacher and a teaching assistant where C.L. could go if he felt overwhelmed at

school.  The program has a dedicated psychologist who provides mandated counseling on both

an individual and group basis.  Parents allege the program did not meet C.L.'s needs to be in

26

small classes in a therapeutic setting.

The SRO considered and rejected Parents' "strong desire or preference" to educate C.L. in small classes, finding the evaluative evidence did "not support a finding that the TSP program was not reasonably calculated to enable [C.L.] to receive educational benefits."  (SRO at 30-31). In addressing whether the TSP was appropriate for C.L. for the 2011-12 school year, the SRO reviewed the entirety of the record and concluded "the TSP program with indirect consultant teacher services and resource rooms services . . . would allow [C.L.] to continue to attend general education classes for each subject area with the necessary 'structure and routine' to assist with his social/emotional difficulties."  (SRO at 21 (quoting C.L.'s 2011 IEP)).  Turning to the 2012-13 school year, the SRO similarly found the TSP remained appropriate "in light of [C.L.'s] demonstrated progress in the areas of his social/emotional and academic needs since the October 2011 CSE."  (SRO at 29).

The record amply supports the SRO's conclusion that the TSP and other elements of the IEPs' program were substantively adequate because they were reasonably calculated to provide C.L. with educational benefits as mandated by IDEA, despite his depression and anxiety.  The relevant inquiry is not whether the proposed IEPs "provided all possible support . . . but rather whether objective evidence indicated that [C.L.] was likely to progress, not regress, under the proposed plan[s]."  A.H. ex rel. J.H. v. Dep't of Educ. of City of New York, 394 F. App'x 718, 721 (2d Cir. 2010).  Given the IDEA's goal to provide disabled children with a public education "while protecting them from being inappropriately sequestered in a special-education classroom," M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d at 145, the

preponderance of the evidence supports the SRO's conclusion regarding the IEPs' proposed program.

### 2.    The IEPs' Reflection of C.L.'s Evaluations

Contrary to Parents' claim, the record reflects the SRO thoroughly scrutinized the evaluative information considered by the October 2011 and June 2012 CSE.  At the CSE to develop C.L.'s IEP for the 2011-12 school year, the CSE reviewed reports showing C.L. was doing well academically, appearing prepared for class and motivated.  The battery of tests and evaluations reviewed by the CSE revealed C.L. to be an extremely bright young man with anxiety and depression affecting his ability to learn.

Parents allege the IEPs did not adequately reflect C.L.'s evaluations because the IEPs did not afford adequate weight to C.L.'s psychiatrist's opinion that returning to Pelham would be detrimental to his well-being.  But the record reflects the SRO considered each piece of evaluative evidence in the record, including C.L.'s psychologist's recommendations.  Parents have failed to call the Court's "attention to an SRO's specific errors in law, fact, or reasoning." M.W. ex rel. S.W., 725 F.3d at 139.  To the contrary, the SRO summarized each evaluation of C.L. in the record and concluded the description of C.L.'s needs in both IEPs were consistent with the evaluative information.  (SRO at 11-17, 24-26).

### 3.    The IEPs' Goals

Parents challenge the goals developed by the October 2011 CSE and the June 2012 CSE as reflected in C.L.'s IEPs.  The IEPs recommended three study skills goals to address C.L.'s needs, and four social or emotional goals which directly addressed C.L.'s social decision-making

and behavior, coping skills, and preparation for crisis situations.  As required by law, these goals were measurable, and the method of recording progress was delineated in the IEPs.

The SRO found "the evidence in the hearing record supports a finding that the annual goals in the October 2011 IEP targeted [C.L.'s] identified areas of need . . . and were sufficiently specific and measurable."  (SRO at 18).  The SRO reached the same conclusion for the June 2012 IEP.

Given the Second Circuit's "instruction that the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers," M.H. v. New York City Dep't of Educ., 685 F.3d at 239 (internal quotations omitted), the Court affirms the SRO's findings as to the adequacy of the goals in C.L.'s IEPs.

4.     The IEPs' Lack of a Crisis Management Plan

Parents contend the IEPs are inadequate for their failure to include a crisis management plan.

The SRO considered whether either the October 2011 or June 2012 CSE should have created a formalized crisis management plan in the IEPs.  The SRO reviewed evidence in the hearing record showing the District responded to C.L.'s past emotional crises in the 8th and 10th grades without a formalized crisis management plan.  The SRO highlighted evidence showing C.L. did not present as being in crisis or present with suicide ideation at the time of either CSE. The Court agrees with the SRO that the record does not indicate C.L. required a formalized crisis management plan.  "In short, we see no reason to second guess the reasonable, professional

determinations of the . . . SRO in this case." T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419 (2d Cir. 2009).

In sum, the SRO's finding that the IEPs were substantively adequate is well-reasoned and supported by a preponderance of evidence in the record.

Because the Court finds C.L.'s October 2011 and June 2012 IEPs were neither procedurally flawed nor substantively deficient, it need not decide whether the private placement at RLS was appropriate, or whether equitable considerations affect relief.  See A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist., 553 F.3d 165, 173 (2d Cir. 2009).

## CONCLUSION

Plaintiffs' motion for summary judgment is DENIED.

Defendant's motion for summary judgment is GRANTED.  The Court affirms the decision of the SRO and dismisses the complaint.

The Clerk is instructed to terminate the motions (Docs. ##13, 15) and close this case.

Dated: December 9, 2015
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge